IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

FEB 09 2000

Michael N. Milby, Clerk

| | | |
|---|---|---|
| JENNIFER VILLARREAL,<br>  Plaintiff | §<br>§<br>§ | |
| v. | §<br>§ | Civil Action No. C-00-052 |
| SAN PATRICIO COUNTY and<br>  PETE RODRIGUEZ, individually<br>  and in his official capacity<br>  Defendants | §<br>§<br>§<br>§ | JURY TRIAL REQUESTED |

**COMPLAINANT'S ORIGINAL PETITION FOR DAMAGES
AND REQUEST FOR JURY TRIAL**

NOW COMES Jennifer Villarreal, Complainant, and complaining of San Patricio County, and Pete Rodriguez, individually and in his official capacity, and for cause of action would show unto the Court as follows:

**I.**

**JURISDICTION**

1.01    This lawsuit arises out of acts and omissions which occurred in San Patricio County, Texas. Jurisdiction is proper before this Court pursuant to 28 USC §1331. This case involves causes of action arising under Title VII of the Civil Rights Act of 1964, and 42 USC 1983. Pursuant to 28 USC §1391, venue is proper in this Court.

1.02    Where appropriate, Complainant invokes this Court's supplemental jurisdiction as to allegations of state claims pursuant to 28 USC §1367. *See also United Mine Workers v. Gibbs* 383 US 715, 726 (1966); *Nolan v. Boeing Co.* 919 F2d 1058, 1063 (5th Cir. 1990).

Plaintiff's Original Complaint for Damages and
Request for Jury Trial - Page 2

## II.

## PARTIES

2.01    Jennifer Villarreal is an individual residing in Nueces County, Texas.

2.02    San Patricio County is a political subdivision of the State of Texas, and may be served with citation by serving its chief executive officer, County Judge Josephine Miller.

2.03    Pete Rodriguez is an individual who may be personally served with citation wherever he might be found. Pete Rodriguez is being sued in his individual capacity and in his official capacity as Commissioner Precinct Three, San Patricio County, Texas.

## III.

## FACTS

3.01    Jennifer Villarreal (hereinafter referred to as "Jennifer") was employed as Administrative Assistant to Mr. Pete Rodriguez (hereinafter referred to as "Commissioner Rodriguez"), County Commissioner for Precinct Three, San Patricio County, Texas. Her employment began in 1997. The office where she worked was located in Odem, Texas. She and Commissioner Rodriguez were the only individuals who worked primarily in the office.

3.02    In March 1998, Commissioner Rodriguez started making comments to Jennifer about her appearance saying things such as "You sure look nice" and "I like the way you look." These comments made her uncomfortable, but what Commissioner Rodriguez was saying, and the comments he was making were not grossly offensive. Comments of this nature continued to where Commissioner Rodriguez was making comments about her physical appearance approximately 2 to 3 times a week. The comments became so frequent that Jennifer began to

question his motives in making them, and they started making her uncomfortable.

3.03     During the first part of April, 1998, Commissioner Rodriguez and Jennifer went to Corpus Christi to attend a one day computer class, each driving their own vehicle. Commissioner Rodriguez and Jennifer went to lunch at Chili's restaurant in Corpus Christi and after they had ordered Commissioner Rodriguez said that they needed to loosen up and order some drinks. He picked up the advertisement of a drink special sitting on the table and said that they could order some of these. The special was an alcoholic beverage. Jennifer declined his offer and told him that they still had the computer class, and Commissioner Rodriguez suggested that they get drunk and skip the class and go to Christy Estates. Jennifer was shocked that Commissioner Rodriguez would try to come on to her in such a fashion. Jennifer rebuffed him and told him she was going back to class. Miss Villarreal didn't talk to him much for the rest of the meal, and he made the comment that she needed to loosen up. After the meal, Commissioner Rodriguez and Jennifer both went back to the computer class.

3.04     The comments about Jennifer's physical appearance and clothing continued at work. Then the comments began to change. Commissioner Rodriguez began saying things such as "I dreamed about you last night" or that his arthritis was acting up and it sure would feel good if Jennifer gave him a rub down. He specifically told Jennifer, "My body feels so sore would you give me a rub down?" Commissioner Rodriguez would question Jennifer if she had ever dreamed about him. Jennifer would try to ignore Commissioner Rodriguez's comments, or would tell him that his conduct was both inappropriate and unappreciated and would request that he leave her alone. Commissioner Rodriguez would respond by shaking his head or laughing, and he

Plaintiff's Original Complaint for Damages and
Request for Jury Trial - Page 4

would continue to make offensive comments.

3.05    Commissioner Rodriguez and Jennifer attended a second computer class at the end of April of 1998 also in Corpus Christi. Before class, Commissioner Rodriguez made another comment about Jennifer's appearance. When she did not respond, Commissioner Rodriguez asked her if the things he said to her made her uncomfortable. Jennifer responded that the comments made her very uncomfortable and asked him to stop making the comments. Commissioner Rodriguez responded that he would stop saying things that made her uncomfortable.

3.06    Commissioner Rodriguez did not live up to his promise to stop the sexual harassment when approximately a week later, Commissioner Rodriguez began again with the personal comments about Jennifer's appearance and his dreams of Jennifer. Commissioner Rodriguez's comments became even more disgusting when he would tell Jennifer that his girlfriend, Irma, was coming to town and that when he would be with her he would be thinking about Jennifer and picturing Jennifer in his mind. Commissioner Rodriguez became more frequent with his comments, and he began gestures of blowing kisses at Jennifer and raising his eyebrows when he made some of his sexually charged comments.

3.07    On numerous occasions Commissioner Rodriguez would call Jennifer into his office, and tell her that it was just because he wanted to look at her, and would ask her to turn around. Jennifer would go back to her desk without saying anything, feeling totally humiliated and as if Mr. Rodriguez was treating her like some sort of object that was there just for his sexual gratification. Commissioner Rodriguez also made the comment several times that he needed to

Plaintiff's Original Complaint for Damages and
Request for Jury Trial - Page 5

leave the office, because he couldn't help himself when he was in the office alone with Jennifer and that he didn't know what he would do if he stayed there with her. These constant comments continued throughout 1998 and permeated the working atmosphere at the office. After the Commissioner's Court enacted a non-fraternization policy for the San Patricio County he would say, "now we'll have to be careful if you want to be with me."

3.08    In January, 1999, Commissioner Rodriguez went into Jennifer's office and told her that she owed him a hug because he got her a pay raise. Jennifer was sitting at her desk and Commissioner Rodriguez sat in a chair in front of her desk. Jennifer told him that she didn't owe him anything, because she had been doing her job and she deserved whatever pay raises she received. This conversation went back and forth for several minutes when Commissioner Rodriguez stood up and walked around behind Jennifer and reached his arms around to hug her. Jennifer used her arms to keep him away and fought him off until he finally stopped. Commissioner Rodriguez then made a couple of comments about collecting what Jennifer "owed him" when she got her paycheck reflecting the increase in salary. Commissioner Rodriguez said that he was the boss, that he got Jennifer her raise and that she owed him. Jennifer told him to get away from her and not to touch her. Jennifer became very concerned for her safety and her job, because it was clear that Commissioner Rodriguez was threatening her with termination if she did not acquiesce to his demand for a sexual relationship.

3.09    After Jennifer made it clear that she would not become involved with Commissioner Rodriguez in a sexual relationship, Commissioner Rodriguez began retaliating against her. Commissioner Rodriguez became obsessed with Jennifer's whereabouts at all times.

Commissioner Rodriguez would yell at Jennifer in person and on the telephone, saying things like "What the fuck are you doing?", or "What the hell are you trying to do to me?" Commissioner Rodriguez made these comments on 14 January 1999 while Jennifer was in a meeting with Steve Kirby, the Emergency Management Director for the County, and two FEMA representatives. Commissioner Rodriguez told Jennifer to tell Mr. Kirby and representatives to "get the fuck out of my office." Commissioner Rodriguez continued to yell at Jennifer, which caused her to be totally humiliated.

3.10     After that incident, the comments and outbursts continued. For the next month and a half, Commissioner Rodriguez did everything he could to intimidate, belittle and sexually harass Jennifer. Some of the things that occurred were:

   A.    On 3 February 1999 Jennifer was sitting at her desk when she dropped a pen on the floor. As she was bending down to pick it up, Commissioner Rodriguez walked in and asked her to bend down again so that he could get another look. He again mentioned that his girlfriend, Irma, was coming to town, and that he would be thinking of Jennifer instead of her. He then began asking Jennifer about her relationship with her husband, and inquired if Jennifer would think about him when she was with her husband.

   B. On 19 February 1999, Kay Whatley, the secretary to County Judge Miller, called Jennifer to inform her that Commissioner Rodriguez's reservations had been made for a conference in Galveston, Texas. When Jennifer informed Commissioner Rodriguez of the reservations, he asked her to go on the trip with him so that "we can have some fun". When he made this comment to Jennifer, he made a suggestive gesture with his eyebrows and acted like he

was blowing a kiss to her.

  C. On 24 February 1999 Jennifer left the precinct office at 11:30 a.m. to pick up some boxes to be used at the offices. When she returned from lunch, Commissioner Rodriguez called her and began yelling at her for leaving the office early. This had been an accepted practice at the office. Because of the hostile nature of the phone call, and the escalating tension she felt while at the office, Jennifer decided that she had to do something about the situation.

3.11 Even though Jennifer knew that making a complaint would put her at great risk of losing her job, the harassing, intimidating and hostile treatment had become more than she could bear. On 1 March 1999 Jennifer made a complaint and gave a statement to County Judge Josephine Miller and Mr. Rick Moore, an investigator for the County Attorney for San Patricio County. Judge Miller told Jennifer that from that point on, Commissioner Rodriguez would not be going in to the Odem, Texas office, and that any messages that needed to be relayed between Jennifer and Commissioner Rodriguez would be done through co-workers.

3.12 The very next day, 2 March 1999, Commissioner Rodriguez began calling Jennifer constantly, and talked to her in a very demeaning manner. Jennifer left her time sheet, along with the time sheets of other employees in the office over the lunch hour for Commissioner Rodriguez to sign. His signature is necessary for the employees of San Patricio County working in Precinct Three to be paid. When Jennifer returned from lunch, Commissioner Rodriguez had failed to sign the time sheets, but left Jennifer a note which was placed upon the time sheets. Commissioner Rodriguez continued to make phone calls to Jennifer that afternoon, which was very upsetting to her.

3.13    Jennifer was contacted that same afternoon by Mr. Rick Moore who asked if Jennifer was going to file a formal complaint. This surprised Jennifer, given that she had made a statement and told Mr. Moore and Judge Miller everything that had happened the previous day. Jennifer asked for a copy of the statement that she had made the previous day, and Mr. Moore informed Jennifer that he would have to check with Judge Miller to see if Jennifer could be given a copy of her own statement. Jennifer told him about all the phone calls from Commissioner Rodriguez, but he didn't say what he would do about them. Jennifer became very concerned that her complaint of sexual harassment was being ignored, and that Commissioner Rodriguez was going to keep harassing her regardless of what anyone told him to do.

3.14    The very next morning Commissioner Rodriguez came to the Precinct Three office in Odem and sat in front of the building and called Jennifer to give her some instructions. It was clear that he was trying to intimidate and harass her. Later that same morning Commissioner Rodriguez went into the office and berated Jennifer for incorrectly handling his personal business. He also put himself in very close proximity to Jennifer by standing over her ostensibly to look at the calendar on her desk. This was very frightening to Jennifer, so she contacted the County Attorney for San Patricio County, Mr. David Aken.

3.15    Jennifer asked why the County was allowing Commissioner Rodriguez to continue his harassing and intimidating behavior by calling her constantly and putting himself in a position where he would physically intimidate her. Mr. Aken told Jennifer that they could not just shut Precinct Three down. Mr. Aken told Jennifer that Commissioner Rodriguez was told to leave her alone. Jennifer tried to explain that Commissioner Rodriguez was continuing to harass and

Plaintiff's Original Complaint for Damages and
    Request for Jury Trial - Page 9

intimidate her. In response to this, Mr. Aken told Jennifer that nothing would be done unless she filed a formal complaint against Commissioner Rodriguez. Jennifer told Mr. Aken that she could not believe what he was saying, given that she had made a complaint and given a statement to Judge Miller. Mr. Aken said that the statement Jennifer had given was not in letter form and was not given to the Personnel Director. Jennifer told Mr. Aken that she had followed the Personnel Policy, and it did not mention the Personnel Director--only the Department Head or the County Judge. It was obvious to Jennifer that the county was not going to do anything about the sexual harassment she had suffered from Commissioner Rodriguez.

3.16    During the rest of that week, Commissioner Rodriguez would constantly call Jennifer at the office. On 5 March 1999 he came into the office and was looking up some information in a notebook in his office. He repeatedly tried to get Jennifer to help him look in the notebook, but she refused to get close to him. Jennifer felt very nervous and frightened, and was becoming more and more angry that nobody was doing anything about her complaint.

3.17    The next week Jennifer again spoke to Judge Miller and told her how Commissioner Rodriguez was continuing to bother her. Judge Miller said that she did not realize that the "complaint" Jennifer had made was in fact a "grievance" under the policies of the County because Jennifer had not used the word "grievance". Miss Villarreal could not believe that because she had not used some "magic word" that nothing had been done. She told Judge Miller that whatever her statement was going to be called, she wanted something to be done about Commissioner Rodriguez's sexually harassing and intimidating behavior. Judge Miller told Jennifer that now that she was going to making a "grievance" the County would have ten days

Plaintiff's Original Complaint for Damages and
Request for Jury Trial - Page 10

from the date of that conversation to respond, and that David Aken would be in charge of making an investigation. Judge Miller also said that Jennifer had to request a specific remedy from the County on the proper forms.

3.18    Jennifer did as Judge Miller requested. David Aken never contacted Jennifer about any investigation. Instead, she was contacted by Mr. Rick Moore. She cooperated with Mr. Moore, and gave him names of people he could talk to. He made it Jennifer's responsibility to get witnesses to call him, and did finally contact a couple of individuals, but only after a great deal of insistence on the part of Jennifer.

3.19    The week of March 15, Jennifer attempted to discover what was going to be done, and even if an investigation was going to be conducted. She attempted to meet with Judge Miller on the Tuesday of that week, but was told that the earliest she could see the judge would be Friday 19 March. During that week Jennifer suffered from repeated phone calls from Commissioner Rodriguez, and he continued to go to the Odem office and bother her. Additionally, Commissioner Rodriguez would not sign Jennifer's time sheets, although he was supposed to do so.

3.20    No individuals were interviewed during the week, although Jennifer contacted the personnel director and complained that nothing was being done and that Commissioner Rodriguez was continuing to bother her.

3.21    At the meeting Jennifer had with Judge Miller on 19 March, Judge Miller informed Jennifer that no action would be taken against Commissioner Rodriguez. Although Jennifer had been visibly upset and emotional during this entire period, Judge Miller said that it was

Plaintiff's Original Complaint for Damages and
    Request for Jury Trial - Page 11

Commissioner Rodriguez who had been traumatized, and characterized his treatment as if he had been to Vietnam and back. Judge Miller was very hostile during the meeting, and insinuated that Jennifer was merely trying to make trouble. Judge Miller informed Jennifer that she had three options: first, she could attempt to engage in some sort of mediated arrangement and continue her employment under Commissioner Rodriguez; two, she could transfer to some other job at the County (without being told what job, salary, hours, etc.); or, three, she could quit her job and the County would give her some sort of severance pay. Jennifer asked that those options be put in writing.

3.22   The next week the only issues that remained were what particular option Jennifer would choose. Judge Miller spoke to Jennifer on Friday of that week and wanted to know what she wanted to do. Jennifer stated that because of the entire situation, and because of the mental toll that it was taking on her, she was just going to quit her job. Judge Miller informed Jennifer that she might be able to trade jobs with Frances Olivarez in Emergency Management.

3.23   Jennifer took the weekend to review her options, and on Monday 29 March 1999, she again spoke to Judge Miller. At that time Jennifer still felt that she wanted to leave her job. Judge Miller informed Jennifer that if she chose to leave her job, she would not be allowed to continue her insurance because the county had a suitable position for her.

3.24   On 1 April 1999 Jennifer went to talk to Judge Miller again about quitting her job. Judge Miller informed her that there was nothing else she would do about the situation. Jennifer asked about the results of the investigation, and Judge Miller said that she couldn't discuss that. Jennifer likewise attempted to talk to David Aken. She asked Mr. Aken what the county would

Plaintiff's Original Complaint for Damages and
    Request for Jury Trial - Page 12

do to protect her from sexual harassment. Mr. Aken started yelling at Jennifer that she didn't appreciate anything that was being done and that it was his job to protect the county. Jennifer was totally humiliated that Mr. Aken would raise his voice at her in such a public area and in front of the people she had to work with.

3.25    On 6 April 1999, late in the afternoon, Judge Miller informed Jennifer that she was being transferred to the job in the Emergency Management Department with Mr. Skip Kirby. Both Mr. Kirby and Mrs. Olivarez made it plain that they were very unhappy with the situation, and that neither of them wanted Jennifer and Mrs. Olivarez to trade places. This was very upsetting to Jennifer, given all that had been occurring.

3.26    The reassignment given Jennifer was undesirable.

3.27    After the transfer, Jennifer asked for some time off because of all the pain, stress and mental anguish she had been going through. At the time she made this request, she was crying in the personnel director's office, and the director called Judge Miller to ask if it would be possible for Jennifer to have some time off. Judge Miller said that Jennifer's request was denied. Jennifer went to her doctor, who advised her that she should take time off. Jennifer's doctor, Dr. Kent Thompkins faxed a doctor's excuse to the county. By using her sick leave and vacation time, Jennifer took one week off.

3.28    Upon returning to the county and starting her job under Mr. Kirby, Jennifer felt that she could no longer work for the county, so she tendered a two week notice. After everything that had happened Jennifer finally decided that enough was enough. The county refused to do anything about how Commissioner Rodriguez treated Jennifer, Commissioner

Plaintiff's Original Complaint for Damages and
    Request for Jury Trial - Page 13

Rodriguez had kept bothering her, and she had all she could take. Jennifer felt humiliated, could not concentrate on her day to day responsibilities, had problems sleeping and just couldn't function any more with all the stress that she was having to endure. Nobody at the county wanted to help Jennifer or wanted to try and stop what Commissioner Rodriguez was doing to her. There was nothing else that Miss Villarreal could do, so she quit her job. Any reasonable person in Jennifer's situation would have felt compelled to resign their position.

3.29     Jennifer did not unreasonably fail to take advantage of any preventative or corrective opportunities provided by the San Patricio County or to avoid harm otherwise.

3.30     San Patricio County did not exercise reasonable care to prevent and correct promptly any sexually harassing behavior.

3.31     Commissioner Rodriguez is within that class of county officials who may be treated as the San Patricio County's proxy.

3.32     In 1998, San Patricio County had been found liable by a jury for violations of Title VII, sexual harassment and retaliation, and the Sheriff of San Patricio County, Leroy Moody, had been found to have violated a female employee's federally protected rights in violation of 42 USC §1983, although he was entitled to the defense of qualified immunity. San Patricio County was on notice that its sexual harassment policies were inadequate. *McKenzie v. Moody* Civil Action No. C-97-121, United States District Court, Southern District of Texas, Corpus Christi Division.

3.33     Although San Patricio County had a judgment rendered against it on 17 April 1998 in excess of $375,000.00, it did not institute any sort of training or educational program to prevent sexual harassment in the work place.

Plaintiff's Original Complaint for Damages and
Request for Jury Trial - Page 14

# IV.

## CAUSES OF ACTION

4.01      Jennifer Villarreal asserts that San Patricio County and Commissioner Pete Rodriguez, in his official capacity, are liable to her for all damages she has suffered because of the sexual harassment and retaliation she endured while working with Commissioner Rodriguez pursuant to Title VII of the Civil Rights Act of 1964 as amended, 42 USC §2000e, et seq.

4.02      Jennifer Villarreal asserts that Commissioner Rodriguez are liable to her for all damages she suffered due to his intentional acts under the following theories of liability: intentional infliction of emotional distress, slander, and assault.

4.03      Jennifer Villarreal asserts that San Patricio County is strictly liable for the actions of Commissioner Rodriguez.

4.04      Jennifer Villarreal asserts that her right to equal protection guaranteed to her under the 14th Amendment to the United States Constitution was violated in violation of 42 USC §1983, and that Commissioner Pete Rodriguez is liable therefore in his individual capacity. *Southard v. Texas Bd. of Criminal Justice* 114 F3d 539 (5th Cir. 1997).

4.05      Jennifer Villarreal asserts that a reasonable county commissioner would have known that assault and sexual harassment would be a violation of her constitutionally protected rights, because those rights had been clearly established at the time of the incident in question.

# V.

## DAMAGES

5.01      Jennifer Villarreal has suffered severe and extreme emotional pain and anguish due

to the acts of San Patricio County and Commissioner Rodriguez, and will continue to suffer egregious emotional pain and anguish into the future. She seeks recovery therefore, and compensatory damages for her lost wages and job benefits. 42 USC §20003-3(a), 2000e-5(g); *Patterson v. P.H.P. Healthcare Corp.* 90 F3rd 927, 935 (5th Cir. 1996), *cert. denied*, 117 S Ct (1997).

5.02     Jennifer Villarreal seeks punitive damages against Commissioner Rodriguez as allowed by law. 42 USC §1983.

5.03     Jennifer Villarreal seeks attorney's fees as allowed by law.

5.04     Jennifer Villarreal seeks front pay because reinstatement is not feasible. 42 USC §2000e-5(g), *Walther v. Lone Star Gas Co.* 952 F2d 119, 127 (5th Cir. 1992).

## VI.

## JURY REQUEST

6.01     Jennifer Villarreal seeks trial of this matter by a jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Jennifer Villarreal respectfully prays this Court cite San Patricio County and Pete Rodriguez to appear and answer herein, and after a trial of this matter by a jury that she be awarded her actual damages, exemplary damages, attorney's fees, front pay, pre- and post-judgment interest at the highest rate allowed by law, and for such other and further relief, at law, or in equity, to which she has shown herself justly entitled.

Plaintiff's Original Complaint for Damages and
Request for Jury Trial - Page 16

ClibPDF - www.fastio.com

Respectfully submitted,

_____
C. L. Wright, III
State Bar No. 22025510
Federal I.D. No. 9252
710 North Mesquite Street
Corpus Christi, Texas 78401
Tel. 361/883-8737, Fax. 361/882-6316